Linda K. BARKER, Barbara Everist, and Roy Letellier, Plaintiffs,

v.

Joyce HAZELTINE, in her Official Capacity as Secretary of State, Defendant.

Civ. No. 97–4242.

United States District Court, D. South Dakota, Southern Division.

March 31, 1998.

Scott D. McGregor, Viken, Viken, Pechota, Leach & Dewell, Rapid City, SD, for Plaintiffs.

Mark W. Barnett, Sherri Sundem Wald, Pierre, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

This case does not determine whether or not it is desirable to establish term limits for United States Representatives and United States Senators. The Federal Constitution does not now impose term limits. In recent years there has been vigorous debate concerning term limits. The Court's decision today does not, should not, and cannot, resolve the ultimate question of whether the Federal Constitution should be amended to limit congressional incumbents to a predetermined number of terms in office. The power to decide that issue lies with the people of the United States, and not with the Federal Judiciary. The Court's decision today decides a separate issue which is properly considered by the Judiciary. The issue is whether the method by which South Dakota Initiated Measure 1 attempts to establish congressional term limits complies with federal constitutional principles. Initiated Mea-

sure 1, adopted by majority vote, directs the South Dakota Secretary of State to place labels on the primary and general election ballots to identify those candidates for United States Senator and United States Representative who do not support the particular term limits provision advocated in Initiated Measure 1. As discussed more fully below, the Court declares Initiated Measure 1 unconstitutional and permanently enjoins its enforcement.

## I. The Parties

The issue is brought to the Court by three plaintiffs through this action for declaratory and injunctive relief. Plaintiff Linda K. Barker is an elected State Representative from Legislative District 13 in Minnehaha County, South Dakota, and she resides in Sioux Falls. Plaintiff Barbara Everist is an elected State Senator from Legislative District 14 in Minnehaha County, and she also lives in Sioux Falls. Plaintiff Roy Letellier is a former elected State Representative from District 29 in Meade and Butte Counties, South Dakota, and he is a former candidate for the office of Public Utilities Commission. He resides in Belle Fourche, in Butte County, South Dakota. The three plaintiffs, as citizens, residents, taxpayers, registered voters, and current or former South Dakota elected officials, have a legal interest in the constitutionality of Initiated Measure 1 which they may properly bring before the Court in this suit pursuant to 42 U.S.C. § 1983.

Defendant Joyce Hazeltine is the duly elected and acting Secretary of State of the State of South Dakota. In her capacity as Secretary of State, defendant Hazeltine is the legally designated custodian of the official laws of the State of South Dakota, and she serves as the chief election official of the State of South Dakota. She is specifically charged with implementing the provisions of Initiated Measure 1. Therefore, Secretary of State Hazeltine also has a legal interest in the resolution of this case.

## II. The History of Initiated Measure 1

On April 10, 1996, the full text of the initiated petition, later designated as Initiated Measure 1, was filed in Secretary of State Hazeltine's office as required by South Dakota law. S.D.Codified Laws Ann. § 2–1–6.2 (1992). On May 6, 1996, Secretary of State Hazeltine received the completed ballot label initiative petition as required by S.D.Codified Laws Ann. § 2–1–2 (1992). On August 9, 1996, after remand by the South Dakota Supreme Court for validation of signatures on certain disputed petition sheets, *Larson v. Hazeltine*, 1996 SD 100, 552 N.W.2d 830 (S.D.1996), Secretary of State Hazeltine filed the initiative petition and declared it Initiated Measure 1 for the 1996 general election. On August 12, 1996, defendant Hazeltine certified the text, statement, title, Attorney General's explanation and recitation of effect of Initiated Measure 1 to all South Dakota County Auditors for inclusion on the 1996 general election ballot, as required by S.D.Codified Laws Ann. § 12–13–1 (1995). Initiated Measure 1 was titled, "An Act requiring South Dakota's Congressional delegation to use their powers to adopt a congressional term limits amendment to the United States Constitution."

The South Dakota Attorney General's ballot explanation of Initiated Measure 1, drafted pursuant to S.D.Codified Laws Ann. § 12–13–9 (1995), stated:

This initiated law would require the U.S. Senators and Representative from South Dakota to use all of their powers to support an amendment to the U.S. Constitution which establishes congressional term limits of three terms for a Representative and two terms for a Senator. If the incumbent Senators and Representative do not use their power in eight designated situations to support a term limits amendment, the Secretary of State would be required to place the words "Disregarded Voters' Instruction on Term Limits" on the ballot next to that candidate's name at his/her next election. A candidate who is not currently in the Senate or the House would be given an opportunity to take a pledge supporting term limits and agreeing, if elected, to use his/her powers to enact the amendment. The Secretary of State would be required to place the words "Declined to Pledge to Support Term Limits" on the ballot next to the name of a candidate who refused to pledge. These restrictions would continue until a constitu-

tional amendment establishing term limits is enacted by Congress and ratified by the states.

At the general election held on November 5, 1996, the voters passed Initiated Measure 1 by a vote of 205,852 (67.59%) in favor of the measure to 98,696 (32.41%) against it. The official state canvass of the vote on Initiated Measure 1 was held on November 15, 1996. The following day, Initiated Measure 1 became law and was codified at S.D.Codified Laws Ann. § 12–16–1.2 (1997 Advance Code Serv.). The full text of Initiated Measure 1 is appended to this decision as Appendix A.

During its 1997 session, the South Dakota Legislature passed House Bill 1188 to repeal Initiated Measure 1 as codified. 1997 S.D.Laws Ch. 80, § 1. Governor William J. Janklow signed the bill on March 11, 1997, repealing Initiated Measure 1 effective July 1, 1997.

On March 25, 1997, the full text of a referendum on House Bill 1188 was filed with Secretary of State Hazeltine pursuant to S.D.Codified Laws Ann. § 2–1–6.2 (1992). On June 9, 1997, defendant Hazeltine received the completed referendum petition with a sufficient number of signatures, and on June 19, 1997, she certified the referendum for inclusion on the 1998 general election ballot as Referred Law 1. The effect of certification of Referred Law 1 was to prevent the repeal of initiated Measure 1 effective July 1, 1997, until the issue could be presented to the voters at the general election on November 3, 1998. Consequently, Initiated Measure 1, requiring ballot labels next to the names of those candidates for United States Senator and United States Representative who do not meet the requirements of Initiated Measure 1, remains the law of South Dakota. *See SDDS, Inc. v. State of South Dakota,* 481 N.W.2d 270, 272 (S.D.1992) ("The purpose for the delay provision [in legislation taking effect] is to allow our citizens time to obtain sufficient signatures to begin the referendum process.")

During the recently-ended 1998 Session, the South Dakota Legislature amended Initiated Measure 1 by passing House Bill 1007 to direct the Secretary of State to take certain actions regarding her implementation of Initiated Measure 1, including a provision requiring candidates for the offices of United States Senator and Representative to file an affidavit or pledge with the Secretary of State by March 1, 1998, attesting to their compliance with Initiated Measure 1. Governor William J. Janklow signed House Bill 1007 on February 14, 1998, and because the bill contained an emergency clause, it became effective immediately. A certified copy of House Bill 1007, as passed by the South Dakota Legislature and signed by Governor Janklow, is appended to this decision as Appendix B.

On February 27, 1998, at the request of plaintiffs, this Court entered a Temporary Restraining Order, effective until the close of business on Tuesday, March 31, 1998, enjoining Secretary of State Hazeltine from implementing the 1998 amendments to Initiated Measure 1. Specifically, the Court enjoined defendant Hazeltine from requiring incumbent candidates for the offices of United States Senator and Representative to complete and return to the Secretary of State a congressional candidate's affidavit and from requiring non-incumbent candidates for the same offices to complete and return a term limits pledge.

Plaintiffs Barker, Everist, and Letellier now challenge the constitutionality of Initiated Measure 1 on several grounds pursuant to 42 U.S.C. § 1983. Secretary of State Hazeltine defends Initiated Measure 1 as constitutional. The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and the Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202. Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(b).

The plaintiffs and the defendant agree that there are no facts in dispute which would require a trial, and the Court is presented only with important questions of federal constitutional law. Counsel for the parties have filed legal briefs which thoroughly and helpfully explain their positions. The Court finds that further oral argument is not necessary.

## III. Analysis

Approximately half of the states had adopted congressional term limit measures by the time the United States Supreme Court declared them unconstitutional in *United States Term Limits, Inc. v. Thornton*, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). The Supreme Court held in *Thornton* that the Federal Constitution prohibits the states from imposing congressional qualifications in addition to those enumerated in the text of the Constitution, and any such fundamental change in the electoral process must be accomplished through the amendment procedures of Article V of the Federal Constitution. *Id.*, at 837, 115 S.Ct. at 1871. The Supreme Court observed that "[p]ermitting individual states to formulate diverse qualifications for their representatives would result in a patchwork of state qualifications, undermining the uniformity and the national character that the Framers envisioned and sought to ensure." *Id.*, at 822, 115 S.Ct. at 1864.

Following the *Thornton* decision, South Dakota supporters of congressional term limits led the effort culminating in Initiated Measure 1. Measure 1 requires congressional candidates, whether incumbents or not, to support the particular term limits proposal contained in Initiated Measure 1 or suffer the consequence of having appear next to the candidate's name, on future primary and general election ballots, the label "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS," or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS." Similar initiatives were undertaken by term limits supporters in other states as well.

Both federal and state courts in some of those jurisdictions have been asked to consider the constitutionality of the initiated measures adopted in those states. With one limited exception, courts have concluded that initiatives similar to Initiated Measure 1 are unconstitutional, and courts have enjoined the enforcement of the initiated measures. This Court recognizes, as Secretary of State Hazeltine urges, that the Court should begin with the presumption that Initiated Measure 1 is constitutional, and the Court does so. *See Casbah, Inc. v. Thone*, 651 F.2d 551, 564 (8th Cir.1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982). For the reasons explained below, however, this Court joins those federal and state courts holding that the method and process utilized in Initiated Measure 1 to require South Dakota congressional candidates to support the specific term limits proposal in Initiated Measure 1 is unconstitutional and will not be enforced.

### A. Article V

The Federal Constitution may be amended only through the process established in Article V of the Constitution. Article V states in pertinent part:

> [t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress[.]

U.S. Const. art. V. This language is plain and leaves no doubt that the only methods permissible for proposing amendments to the Constitution are by two-thirds vote of Congress or by application of two-thirds of state legislatures. The amendments proposed in either of these two ways become effective upon ratification by three-fourths of the state legislatures or by an equal number of state conventions. *See League of Women Voters of Maine v. Gwadosky*, 966 F.Supp. 52, 55 (D.Maine 1997). The Framers intended for the amendment process "to be a deliberate and often difficult task," *id.* at 56, and the Framers did not provide for a direct role of the citizens in proposing and ratifying constitutional amendments. *Id.* at 55–56. The citizens' role is to elect competent state and congressional legislators who may, in turn, amend the Constitution in accordance with the methods described in Article V. *Id.* at 56. "Not only did the Framers require a super majority in Congress and of the vari-

ous state legislatures, but the bodies granted the power to propose and ratify amendments were specifically designated. No exceptions were allowed." *Id.*

In *Hawke v. Smith*, 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), the Supreme Court held that a provision in the Ohio constitution allowing ratification of proposed amendments to the Federal Constitution by citizen referendum conflicted with the amendment process outlined in Article V. In holding the Ohio provision unconstitutional, the Supreme Court stated that the power to ratify a constitutional amendment derives from the Federal Constitution and that the people, through a process of referendum, cannot amend the Federal Constitution. *Id.,* at 230, 40 S.Ct. at 498. The result of the *Hawke* case was that the people of Ohio lacked power to ratify directly the Eighteenth Amendment, which enacted Prohibition in the United States. Shortly after *Hawke,* in *Leser v. Garnett,* 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), the Supreme Court was presented with the argument that the Nineteenth Amendment, which granted women the right to vote, was not a valid Amendment because the constitutions of several of the thirty-six states that ratified the Amendment did not permit ratification of constitutional amendments by their legislatures. The Supreme Court concluded that the power to ratify federal constitutional amendments is derived from Article V of the Federal Constitution and that the various states were not required to have a specific constitutional or statutory provision permitting ratification by the state legislatures. *Id.* at 137, 42 S.Ct. at 217–18.

While both *Hawke* and *Leser* pertained to ratification of constitutional amendments, the rationale of those cases applies equally to the proposal of constitutional amendments. Both cases strongly indicate the Supreme Court's view that the function of the citizens in the amendment process is strictly limited to the election of federal and state officials. *See Gwadosky,* 966 F.Supp. at 57. Nonetheless, a 1978 decision issued by Justice Rehnquist, acting as a Circuit Justice, held that a purely advisory referendum requested by the Nevada state legislature regarding the citizens' position on the proposed Equal Rights

Amendment did not offend Article V principles. *Kimble v. Swackhamer,* 439 U.S. 1385, 1386–1388, 99 S.Ct. 51, 53–54, 58 L.Ed.2d 225 (Rehnquist, Circuit Justice (1978)). The Nevada Legislature solicited information from the citizens as to whether they favored the amendment, but the Legislature retained the authority to act on the proposed amendment in the way it determined best. Justice Rehnquist wrote that Article V does not eliminate all communication between state legislatures and the citizens and that there is "no constitutional obstacle to a nonbinding, advisory referendum" of the kind utilized in Nevada. *Id.* at 1388, 99 S.Ct. at 54.

South Dakota's Initiated Measure 1 is neither purely advisory, like the citizen referendum analyzed in *Kimble,* nor does it delegate complete authority to authorize constitutional amendments to the citizens of South Dakota, which is prohibited by *Hawke* and *Leser.* Initiated Measure 1 falls somewhere on the spectrum between the two extremes. *See Gwadosky,* 966 F.Supp. at 57. If South Dakota's congressional candidates fail to comply with the provisions of Initiated Measure 1, they are sanctioned by the placement of a negative label next to their names in the ballot box.

Initiated Measure 1 is not a "nonbinding, advisory referendum" like that envisioned by then-Justice Rehnquist. Rather, Initiated Measure 1 attempts to accomplish indirectly what Article V of the Federal Constitution prohibits South Dakota citizens from doing directly. *See Thornton,* 514 U.S. at 829, 115 S.Ct. at 1867; *Gwadosky,* 966 F.Supp. at 59. Thus, the Court does not agree with the defendant that the sentence in Initiated Measure 1, "[e]ach member of the state's congressional delegation shall use all of their powers to pass a congressional term limits amendment[,]" may be read as a nonbinding advisory expression of the will of the South Dakota people. The purpose of Initiated Measure 1 is to mandate that South Dakota congressional candidates support the term limits amendment specifically defined in Initiated Measure 1. Congressional candidates are given no discretion to support some other proposed term limits amendment or to oppose the concept of term limits. Initiated

Measure 1's tool of coercion and its price for disobedience is the mandatory placement of a negative label next to the candidate's name on the ballot.

The ballot labels at issue here are not neutral. The phrases "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" and "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" convey negative connotations. They are, effectively, "brands of disapproval by the State," *Gwadosky*, 966 F.Supp. at 60, and they are disseminated to voters at a time when voters are most susceptible to persuasion—while they are in the ballot box—and at a time when candidates are most politically vulnerable. One court referred to such ballot labels as "threaten[ing] potential political death[.]" *Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119, 127–28 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997). These labels coerce congressional candidates to follow the dictates of Initiated Measure 1 regardless of the merits of the term limits proposal contained within it. To suggest that placement of such labels on the ballot would not affect a congressional candidate's judgment "raises naivete to new heights." *Gwadosky*, 966 F.Supp. at 60. Without doubt, Initiated Measure 1 brings to bear an undue influence on South Dakota's congressional candidates, and the deliberative and independent amendment process envisioned by the Framers when they drafted Article V is lost.

Because the Court cannot agree that Initiated Measure 1 can be read as a nonbinding advisory initiative, the Court is not persuaded by defendant Hazeltine's reliance upon the Idaho Supreme Court's opinion in *Simpson v. Cenarrusa*, 130 Idaho 609, 944 P.2d 1372 (Idaho 1997). In that case, the court struck down similar ballot labels as violative of the Speech and Debate clause of the Federal Constitution, U.S. Const. art. 1, § 6, a conclusion with which this Court agrees later in this opinion. Having struck down the ballot labels, the Idaho Supreme Court then applied the severability clause of the initiative to hold that the remaining provisions amounted to a nonbinding advisory that did not violate Article V. *Id.* 944 P.2d at

1375–77. This Court concludes that Initiated Measure 1 is not severable because all of its provisions are integral and indispensible to one another. Therefore, the Court will not follow the Idaho Supreme Court's action in severing the provisions regarding ballot labels from the remainder of the initiative. Moreover, the Court believes, based upon its own analysis, and upon the analysis of all the other cases cited in this opinion, that *Simpson* is wrongly decided on the Article V issue.

State courts in other jurisdictions have held that citizen initiatives similar to Initiated Measure 1 violate Article V. The Court has carefully considered the decision of the Arkansas Supreme Court in *Donovan*, the decision of the Colorado Supreme Court in *Morrissey v. State of Colorado,* 951 P.2d 911 (Colo.1998), and the decision of the Supreme Court of Oklahoma in *In re Initiative Petition No. 364,* 930 P.2d 186 (Okla.1996). The Court has also considered the Advisory Opinion presented to the Maine House of Representatives by the Supreme Judicial Court of Maine in *Opinion Of The Justices*, 673 A.2d 693 (Me.1996). These decisions lend support to the Court's conclusion that Initiated Measure 1 violates Article V of the Federal Constitution because it allows the citizens to do indirectly what they may not do directly and thereby destroys the constitutional amendment process created by the Framers.

The Court draws further support from the cases of *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 691 P.2d 826 (1984), and *American Fed. Of Labor–Congress Of Indus. Org. v. Eu*, 36 Cal.3d 687, 686 P.2d 609, 206 Cal.Rptr. 89 (1984) (en banc). In both of those cases, the Supreme Courts of Montana and California held unconstitutional citizen initiatives mandating that their state legislatures apply to Congress for a constitutional convention to consider a balanced budget amendment. Both courts held that such initiatives violate the principles enunciated in Article V of the Federal Constitution.

In summary, South Dakota's United States Senators and United States Representative are elected to use their good judgment for the benefit of the country as a whole, not only for the benefit of South Dakota citizens.

*See Thornton,* 514 U.S. at 804, 115 S.Ct. at 1855 ("The text of the Constitution thus gives the representatives of all the people the final say in judging the qualifications of the representatives of any one State.") Congressional officeholders must not, and cannot, be bound to speak and vote in one particular way on the important issue of congressional term limits. Each officeholder must have the discretion to consider changing circumstances and to revise his or her own thinking on the term limits issue, even if that means that the officeholder ultimately takes a different position than the one he or she firmly supported prior to the election. The Court holds that Initiated Measure 1 violates Article V of the Federal Constitution, and the Court declares Initiated Measure 1 unconstitutional on that ground.

### B. First and Fourteenth Amendments

█ Plaintiffs contend that Initiated Measure 1 is also unconstitutional because it violates the Free Speech rights of congressional candidates, as guaranteed by the First Amendment, as well as the right to equal access to the ballot, as guaranteed by the Fourteenth Amendment. Initiated Measure 1 mandates adherence to a specific term limits amendment and sanctions all those who dare to disagree. Even a candidate who strongly supports term limits violates the dictates of Initiated Measure 1 if he or she supports some other version of a terms limits amendment. Those candidates who openly do not support Initiated Measure 1 face labeling at the ballot box, while those candidates who support it or hide their true views appear on the ballot without a negative label attached.

█ Free speech is dear to every American citizen, and political speech lies at the very core of the First Amendment's protection. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 117 S.Ct. 1364, 1369, 137 L.Ed.2d 589 (1997); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Free and open speech is absolutely essential to those individuals who seek public office, as well as to those who are elected to public office. Freedom of speech and debate are essential to any democratic form of government, for it is only through vigorous discussion of conflicting ideas that sound decisions are made for the good of the country at large. Because the freedom of speech plays such a central role in our history, our government, and our jurisprudence, laws burdening political speech must be analyzed under a "strict scrutiny" standard. *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Moreover, when an equal protection challenge to ballot access is brought, the Court must consider "whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (quoted case omitted).

The Court agrees with plaintiffs that it is hard to imagine a more chilling impact on political speech than that created by Initiated Measure 1. It is also difficult to see how such a provision can create any greater unfairness or unnecessary burden on the availability of political opportunity. However well-meaning the proponents of Initiated Measure 1 may be, the result of their labors strips congressional candidates of all rights to free speech and debate with regard to the issue of congressional term limits. If this method of limiting free speech and debate were accepted, surely other speech limitations on many other issues would follow. As the freedom of speech on issues is diminished, so is the freedom of thought on those same issues, since our political system thrives on an open and robust exchange of ideas. This method, if allowed, would diminish our political system as it now exists. Elected representatives must not be deprived of their legislative discretion. "In our system, the people set policy by choice, not control, of their elected representatives." *Morrissey,* 951 P.2d at 917.

The constitutionality of Initiated Measure 1 cannot be saved by characterizing the ballot labels threatened for noncompliant candidates as proper time, place, and manner restrictions. Without doubt, the Federal Constitution grants states broad power to control the election process for United States Senators and Representatives. U.S. Const. art. I, § 4, cl. 1; *Timmons,* 520 U.S.

351, 117 S.Ct. at 1369–70, 137 L.Ed.2d 589. But the ballot labels created by Initiated Measure 1 go far beyond informing the electorate about the stand of any candidate on the term limits issue. *See ·Duggan v. Moore,* 4:CV97–3074, Memorandum And Order at 7–8 (D.Neb. May 15, 1997) (unpublished) (holding negatively-worded ballot labels imposed for failure to support term limits provision fail to meet even minimal requirements that such regulations be reasonable and nondiscriminatory). As already mentioned, these ballot labels essentially brand the candidates as unworthy of public office because they ·would not support one particular term limits provision. The defendant is correct that candidates for public office do not enjoy a constitutional right to hide their views from the voters on major issues. But the threatened imposition of a ballot label, as a sanction for taking any position other than that advocated in Initiated Measure 1, thwarts the political debate that is critical to public decisionmaking.

As previously stated, what is at issue in this case is not the question of whether term limits are a good idea. The issue is whether the procedure used in an attempt to establish term limits is a procedure in keeping with our Federal Constitution. The Court concludes that it is not. Therefore, the Court declares Initiated Measure 1 unconstitutional as violative of the First and Fourteenth Amendments.

### C. *Speech ·and Debate Clause*

◼ Plaintiffs contend that Initiated Measure 1 violates Article I, Section 6, Clause 1 of the United States Constitution because it requires Secretary of State Hazeltine to question, and perhaps sanction, South Dakota's United States Senators and Representative about their positions on term limits at a place other than either House of Congress. As the Idaho Supreme Court observed, this clause was designed by the Framers to assure the co-equal Legislative Branch of government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch and without accountability before a possibly hostile Judiciary. *Simpson,* 944 P.2d at 1375 (citing *Gravel*

*v. United States,* 408 U.S. 606, 616, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972)). Any restriction on a legislator's freedom ultimately undermines the public interest by interfering with the rights of the people to representation in the democratic process. The Court declares Initiated Measure 1 unconstitutional as violative of the Speech and Debate Clause.

### D. *Fifth and Fourteenth Amendments*

◼ Finally, plaintiffs assert that Initiated Measure 1, even as recently amended by the 1998 Legislature, violates the Due Process requirements of the Fifth and Fourteenth Amendments because, if it contains standards at all by which the Secretary of State may determine which candidates should have the negative ballot label· affixed adjacent to their names, such standards are vague and arbitrary. The Court agrees with plaintiffs' assessment. ˙ As currently amended, Initiated Measure 1, § 12–16–1.2(8), provides: ·

> The secretary of state shall make an accurate determination as to whether the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" is placed adjacent to a candidate's name on the election ballot pursuant to this section. The secretary. of state in making this · determination may rely exclusively on the affidavit. or pledge which is filed pursuant to section 1 or 2 of this Act.

Subsection (8) fails to establish any standards by which the Secretary of State shall make "an accurate determination" other than reliance upon the affidavits or pledges filed by congressional candidates. The "Incumbent Congressional Candidate's Affidavit" drafted to satisfy § 12–16–1.2(8) requires candidates to state whether they have complied with Initiated Measure 1 by providing "Yes" or "No" answers to eight specific questions without any elaboration. The Court concludes that the "Incumbent Congressional Candidate's Affidavit" or a similar non-incumbent candidate's pledge, violates the candidates' Due Process rights as secured by the Fifth and Fourteenth Amendments. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–10, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d

222 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."); *Postscript Enterprises, Inc. v. Whaley,* 658 F.2d 1249, 1254 (8th Cir.1981) (same). Therefore, the Court declares Initiated Measure 1 unconstitutional on the Due Process ground as well.

### E. Referred Law 1

 In light of the Court's declaration that Initiated Measure 1 is unconstitutional, a question arises whether Referred Law 1, which seeks to obtain a majority vote of the electorate to overturn the South Dakota Legislature's repeal of Initiated Measure 1, should appear on the November 1998 general election ballot. The Court concludes that Referred Law 1 has become moot in light of the Court's declaration of unconstitutionality of Initiated Measure 1 and that Referred Law 1 should not appear on the November 1998 general ballot. Even if the voters were to pass Referred Law 1 and overturn the Legislature's repeal, this Court has declared Initiated Measure 1 unconstitutional, and its provisions would not take effect in violation of the permanent injunction entered in this case. Accordingly,

IT IS ORDERED:

(1) that plaintiffs' Motion for Summary Judgment is granted. (Doc. 12.)

(2) that defendant's Motion for Summary Judgment is denied. (Doc. 9.)

(3) that Initiated Measure 1, S.D.Codified Laws Ann. § 12–16–1.2, as amended through February 14, 1998, is declared unconstitutional as violative of Article V, Article I, § 6, cl. 1, and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

(4) that the Court enters a permanent injunction enjoining defendant Joyce Hazeltine, in her official capacity as Secretary of State of the State of South Dakota, and her officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with her, from carrying out, implementing, and enforcing the provisions of Initiated Measure 1, S.D.Codified Laws Ann. § 12–16–1.2, in any man-

ner whatsoever, in accordance with this Memorandum Opinion and Order.

(5) that the Court declares moot Referred Law 1, which had been certified for inclusion on the 1998 general election ballot, and Referred Law 1 will not appear on the 1998 general election ballot.

(6) that plaintiffs, as prevailing parties under 42 U.S.C. § 1988, will be entitled to reasonable attorney's fees, expenses, and costs upon presentation to the Court of a properly supported post-Judgment motion.

### JUDGMENT

In accordance with the Memorandum Opinion and Order entered this date with the Clerk,

IT IS ORDERED, ADJUDGED, and DECREED:

(1) that Judgment is entered in favor of plaintiffs Linda K. Barker, Barbara Everist, and Roy Letellier and against defendant Joyce Hazeltine, Secretary of State of the State of South Dakota.

(2) that Initiated Measure 1, S.D.Codified Laws Ann. § 12–16–1.2, as amended through February 14, 1998, is declared unconstitutional as violative of Article V, Article I, § 6, and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

(3) that the Court enters a permanent injunction enjoining defendant Joyce Hazeltine, in her official capacity as Secretary of State of the State of South Dakota, and her officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with her, from carrying out, implementing, and enforcing the provisions of Initiated Measure 1, S.D.Codified Laws Ann. § 12–16–1.2, in any manner whatsoever, in accordance with this Memorandum Opinion and Order.

(4) that the Court declares moot Referred Law 1, which had been certified for inclusion on the 1998 general election ballot, and Referred Law 1 will not appear on the 1998 general election ballot.

(5) that plaintiffs, as prevailing parties under 42 U.S.C. § 1988, are entitled to attorney's fees from defendant in the amount of

_____ and costs from defendant in the amount of $_____, as hereinafter determined by the Court and inserted in the Judgment by the Clerk.

APPENDIX A

**CHAPTER 12–16**

BALLOTS AND ELECTION SUPPLIES

Section 12–16–1.2. Ballot to reflect congressional term limits amendment.

**12–16–1.2. Ballot to reflect congressional term limits amendment.**

(1) For the purposes of this section, a congressional term limits amendment is any amendment to the United States Constitution which is defined as follows:

 (a) No person shall serve in the office of United States Representative for more than three terms, but upon ratification of this amendment no person who has held the office of United States Representative or who then holds the office shall serve for more than two additional terms.

 (b) No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the office shall serve more than one additional term.

 (c) This article shall have no time limit within which it must be ratified by the legislatures of three-fourths of the several states.

(2) Each member of the state's congressional delegation shall use all of their powers to pass a congressional term limits amendment.

(3) All primary and general election ballots shall have printed the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" adjacent to the name of any United States Senator or Representative from South Dakota who:

 (a) Fails to vote in favor of a proposed congressional term limits amendment, as defined by this section, when brought to a vote;

 (b) Fails to second a proposed congressional term limits amendment, as defined by this section, if it lacks for a second before any proceeding of the legislative body;

 (c) Fails to propose or otherwise bring to a vote of the full legislative body a proposed congressional term limits amendment, as defined by this section, if it otherwise lacks a legislator who so proposes or brings to a vote of the full legislative body a proposed congressional term limits amendment as defined by this section;

 (d) Fails to vote in favor of all votes bringing a proposed congressional term limits amendment, as defined by this section, before any committee or subcommittee of the respective house · upon which the member serves;

 (e) Fails to reject any attempt to delay, table, or otherwise prevent a vote by the full legislative body of a proposed congressional term limits amendment as defined by this section;

 (f) Fails to vote against any proposed constitutional amendment that would establish longer term limits than those set forth in subdivision (1) of this section regardless of any other actions in support of a proposed congressional term limits amendment as defined by this section;

 (g) Sponsors or co-sponsors any proposed constitutional amendment or law that establishes longer term limits than those set forth in subdivision (1) of this section; or

 (h) Fails to ensure that all votes on a congressional term limits amendment are recorded and made available to the public.

(4) The information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" may not appear adjacent to the names of incumbent candidates for Congress if a congressional term limits amendment, as defined by this section, is before the states for

ratification or has become part of the United States Constitution.

(5) Non-incumbent candidates for the United States Senate and House of Representatives shall be given an opportunity to take a term limits pledge when the candidate files to run for such office. Any non-incumbent candidate who declines to take the term limits pledge shall have the information "DECLINED TO PLEDGE TO SUPPORT TERMS LIMITS" printed adjacent to the candidate's name on every primary and general election ballot.

(6) The term limits pledge provided by subdivision (5) of this section shall be offered to non-incumbent candidates for the United States Senate and House of Representatives until a congressional terms limits amendment, as defined by this section, has been ratified by the states.

(7) The term limits pledge that each non-incumbent candidate, as provided by subdivision (5) of this section, shall be offered is as follows: I support term limits and pledge to use all my legislative powers to enact a congressional term limits amendment as defined by this section. If elected, I pledge to vote in such a way that the designation "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" will not appear adjacent to my name.

_____

Signature of Candidate

(8) The secretary of state shall make an accurate determination as to whether the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" is placed adjacent to a candidate's name on the election ballot pursuant to this section.

(9) The secretary of state shall consider timely submitted public comments prior to making the determination required in subdivision (8) of this section.

(10) The secretary of state, in accordance with subdivision (8) of this section shall determine and declare what information, if any, shall appear adjacent to the names of each incumbent member of the United States Senate or House of Representatives if the member is a candidate in the next election. This determination and declaration shall be made in a timely manner to ensure the orderly printing of primary and general election ballots with allowance made for all legal action as provided in subdivisions (11) and (12) of this section. This determination and declaration shall be based upon the member's action during the member's current term of office and any action taken in any concluded term, if the action was taken after the determination and declaration was made by the secretary of state in a previous election.

(11) If the secretary of state makes the determination that the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" is not to be placed on the ballot adjacent to the name of a candidate as provided by this section, any elector may appeal such decision within five business days to the South Dakota Supreme Court as an original action or shall waive any right to appeal such decision. The burden of proof shall be upon the secretary of state, relying on information provided by the candidate, to demonstrate by clear and convincing evidence that the candidate has met the requirements set forth in this section and therefore should not have the information "DISREGARDED VOTERS' INSTRUCTION OF TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed on the ballot adjacent to the candidate's name.

(12) If the secretary of state determines that the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" shall be placed on the ballot adjacent to a candidate's name, the candidate may appeal such decision within five business days to the South Dakota Supreme Court as an original action or shall waive any right to appeal such decision. The burden of proof shall be upon the candidate to demonstrate by clear and convincing evidence that the candidate should not have the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or

"DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed on the ballot adjacent to the candidate's name.

(13) The Supreme Court shall hear the appeal provided for in subdivisions (11) and (12) of this section within twenty days and issue a decision not later than thirty days before the date of the primary election and sixty days before the date of the general election.

(14) Upon the ratification of a congressional term limits amendment as defined by this section, this section shall be repealed.

(15) Any legal challenge to this section shall be filed as an original action before the Supreme Court of this state.

(16) If any portion, clause, or phrase of this initiative is, for any reason, held to be invalid or unconstitutional by a court of competent jurisdiction, the remaining portions, clauses, and phrases shall not be affected, but shall remain in full force and effect.

Source: 1996 Initiated Measure No. 1, approved Nov. 5, 1996, effective Nov. 16, 1996.

## APPENDIX B

## AN ACT

ENTITLED, An Act to revise the requirements concerning a candidate's support of congressional term limits and to provide the board of elections with rule-making authority for implementing the voter's instructions on term limits and to declare an emergency.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:

Section 1. That subdivision (3) of § 12–16–1.2 be amended to read as follows:

(3) All primary and general election ballots shall have printed the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" adjacent to the name of any United States Senator or Representative from South Dakota who:

(a) Fails to vote in favor of a proposed congressional term limits amendment, as defined by this section, when brought to a vote;

(b) Fails to second a proposed congressional term limits amendment, as defined by this section, if it lacks for a second before any proceeding of the legislative body;

(c) Fails to propose or otherwise bring to a vote of the full legislative body a proposed congressional term limits amendment, as defined by this section, if it otherwise lacks a legislator who so proposes or brings to a vote of the full legislative body a proposed congressional term limits amendment as defined by this section;

(d) Fails to vote in favor of all votes bringing a proposed congressional term limits amendment, as defined by this section, before any committee or subcommittee of the respective house upon which the member serves;

(e) Fails to reject any attempt to delay, table, or otherwise prevent a vote by the full legislative body of a proposed congressional term limits amendment as defined by this section;

(f) Fails to vote against any proposed constitutional amendment that would establish longer term limits than those set forth in subdivision (1) of this section regardless of any other actions in support of a proposed congressional term limits amendment as defined by this section;

(g) Sponsors or co-sponsors any proposed constitutional amendment or law that establishes longer terms limits than those set forth in subdivision (1) of this section; or

(h) Fails to ensure that all votes on a congressional term limits amendment are recorded and made available to the public.

An incumbent candidate who has complied with these eight requirements shall file a sworn affidavit acknowledging that the candidate has not failed to comply with each of these eight requirements during the member's current term of office or any concluded term in which a determination and declaration was made by the secretary of state in a

previous election. The affidavit shall be filed in the Office of the Secretary of State or mailed to the Office of the Secretary of State by registered mail by March first of the general election year for candidates who file for nomination pursuant to chapter 12–6 or by August first for candidates who file for nomination pursuant to chapter 12–7.

Section 2. That subdivision (5) of § 12–16–1.2 be amended to read as follows:

(5) Nonincumbent candidates for the United States Senate and House of Representatives shall be given an opportunity to take a term limits pledge. The pledge shall be filed in the Office of the Secretary of State or mailed to the Office of the Secretary of State by registered mail by March first of the general election year for candidates who file for nomination pursuant to chapter 12–6 or by August first for candidates who file for nomination pursuant to chapter 12–7. Any nonincumbent candidate who declines to take the term limits pledge shall have the information "DECLINED TO PLEDGE TO SUPPORT TERMS LIMITS" printed adjacent to the candidate's name on every primary and general election ballot.

Section 3. That subdivision (8) of § 12–16–1.2 be amended to read as follows:

(8) The secretary of state shall make an accurate determination as to whether the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" is placed adjacent to a candidate's name on the election ballot pursuant to this section. The secretary of state in making this determination may rely· exclusively on the affidavit or pledge which is filed pursuant to section 1 or 2 of this Act.

Section 4. That subdivision (9) of § 12–16–1.2 be amended to read as follows:

(9) The secretary of state shall consider public comments submitted to the Office of the Secretary of State by March first of the general election year for candidates who file for nomination pursuant to chapter 12–6 or by August first for candidates who file for nomination pursuant to chapter 12–7 prior to making the determination required in subdivision (8) of this section.

Section 5. That subdivision (13) of § 12–16–1.2 be amended to read as follows:

(13) The Supreme Court shall hear the appeal provided for in subdivisions (11) and (12) within twenty days and issue a decision not later than sixty days before the date of the primary or general election.

Section 6. That § 12–16–1.2 be amended by adding thereto a NEW SUBDIVISION to read as follows:

The Board of Elections may promulgate rules pursuant to chapter 1–26 to provide forms, deadlines, and procedures for implementing this section.

Section 7. Whereas, this Act is necessary for the support of the state government and its existing public institutions, an emergency is hereby declared to exist, and this Act shall be in full force and effect from and after its passage and approval.

An Act to revise the requirements concerning a candidate's support of congressional term limits and to provide the board of elections with rule-making authority for implementing the voter's instructions on term limits and to declare an emergency.

I certify that the attached Act originated in the

HOUSE as Bill No. 1007

*Karen Gerdes*
Chief Clerk

*[signature]*
Speaker of the House

Attest:

*Karen Gerdes*
Chief Clerk

*[signature]*
President of the Senate

Attest:

*Patricia Adam*
Secretary of the Senate

House Bill No. 1007
File No. ____
Chapter No. _____

· Received at this Executive Office this 11th day of *February*, 1997 at 3:15 PM.

By *Catherine M Sutfe*
for the Governor

The attached Act is hereby approved this 14th day of *February*, A.D., 1998

*[signature]*
Governor

STATE OF SOUTH DAKOTA,
ss.

Office of the Secretary of State

Filed Feb 14, 1998
at 10:45 o'clock A M.

_____
Secretary of State

By *Thomas Perkey*
Asst. Secretary of State