[No. S076784. July 8, 1999.]

NANCY BRAMBERG et al., Petitioners, v.
BILL JONES, as Secretary of State, etc., Respondent.

■■■■■■■■

## COUNSEL

Olson, Hagel, Leidigh, Waters & Fishburn, George Waters, N. Eugene Hill, Deborah B. Caplan; Norris & Norris and Michael A. Sweet for Petitioners.

Bill Lockyer, Attorney General, Linda A. Cabatic, Assistant Attorney General, Paul H. Dobson and Leslie R. Lopez, Deputy Attorneys General, for Respondent.

## OPINION

**GEORGE, C. J.**—Petitioners—a taxpayer and registered voter, a prospective candidate for public office, and two elected public officials—filed this original writ proceeding in this court on February 25, 1999, challenging the constitutional validity of Proposition 225, an initiative measure relating to congressional term limits that was narrowly adopted by the electorate at the June 2, 1998, Primary Election. Among other provisions, Proposition 225 "instruct[s]" elected federal and state legislators to propose and support a specific congressional term limits amendment to the United States Constitution that is set out verbatim in the measure. It also directs the Secretary of State, in future elections for congressional and state legislative offices, to include on the election ballot, adjacent to the name of any incumbent or nonincumbent candidate who has failed to support or pledge support for the proposed amendment, the phrase "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" OR "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS."

In challenging the validity of this measure, petitioners point out that in the argument in favor of Proposition 225 appearing in the official ballot pamphlet distributed to the voters, *the proponent* of the measure acknowledged that measures similar to Proposition 225 had been found invalid by a number of courts in other jurisdictions and stated that "passage of this measure will likely result only in needless and costly litigation." (Ballot Pamp., Proposed initiatives with arguments to voters, Primary Elec. (June 2, 1998), argument in favor of Prop. 225, p. 26.) As a consequence, the proponent's ballot argument urged voters *not* to vote in favor of Proposition 225 but instead to support another measure relating to congressional term limits that the proponent indicated would be presented to the voters in the future.

A majority of those electors who voted on this measure at the June 1998 election nonetheless voted in favor of Proposition 225. Petitioners maintain that the measure is unconstitutional and may not be enforced. In order to avoid the confusion and unnecessary expense that would result from state efforts to implement this measure, petitioners urge this court to issue a writ of mandate, directing the Secretary of State not to enforce its provisions.

On April 14, 1999, we issued an order directing the Secretary of State to show cause why the challenged proposition should not be found unconstitutional, and established an accelerated briefing and oral argument schedule. In briefing and oral argument, the Secretary of State indicated that while he has doubts as to the validity of the measure, the measure is entitled to a presumption of constitutionality and he is required to apply the provision unless and until it is held invalid by a court; the Secretary also has urged the court to decide the matter as expeditiously as is practicable.

■ For the reasons discussed below, we agree with the numerous out-of-state decisions that have addressed similar initiative measures, and conclude that the challenged proposition is unconstitutional. As we shall explain, past decisions of both the United States Supreme Court and this court clearly hold that article V of the United States Constitution (hereafter Article V) vests the power to propose and ratify amendments of the United States Constitution solely in deliberative representative bodies—Congress, state legislatures, or constitutional conventions—and does not authorize such amendments either to be mandated or defeated by a direct vote of a state's electorate through an initiative or referendum. Because Proposition 225 both directly instructs, and indirectly attempts to coerce, California's congressional and state legislators in the exercise of their federal constitutional function of proposing and ratifying amendments to the United States Constitution, we conclude that the proposition clearly conflicts with the amendment process authorized by Article V and is therefore unconstitutional. Accordingly, a writ of mandate shall issue, directing respondent Secretary of State not to enforce the provisions of Proposition 225.

I

A

At the outset, we emphasize that the sole question before us in this proceeding is the validity of the particular term limits measure embodied in Proposition 225, and not the desirability or wisdom of term limits in general or the validity of other term limits provisions.

In this regard, a brief review of the various term limitation measures adopted in California in the past decade may be helpful in placing the present controversy in perspective.

At the November 1990 General Election, California voters passed an initiative measure, Proposition 140, which, among other features, added to the California Constitution various provisions establishing term limitations for *state* legislators and various *state* constitutional officers.[1] Shortly thereafter, this court considered a constitutional challenge to the term limitations imposed by Proposition 140, and concluded that the term limitations established by that provision did not violate the First or Fourteenth Amendment of the federal Constitution and were constitutionally valid. (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 514-525 [286 Cal.Rptr. 283, 816 P.2d 1309].) Accordingly, since November 1990, the terms of office that elected state officials in California may serve have been subject to the limitations imposed by Proposition 140.

In 1992, California voters adopted Proposition 164, which proposed to establish specific term limits for California's *congressional* delegation, i.e., the California members of the United States Senate and of the United States House of Representatives.[2] The provisions of Proposition 164, however, never have been enforced, because soon after the measure was enacted the United States Supreme Court held that a similar congressional term limits provision, enacted by the State of Arkansas, was unconstitutional on the ground that qualifications for federal elective office may not be established by state law (or by federal statute) but are governed by the provisions of the United States Constitution, which do not provide for term limits and which may be changed only by amendment of the United States Constitution. (*U.S. Term Limits, Inc.* v. *Thornton* (1995) 514 U.S. 779 [115 S.Ct. 1842, 131 L.Ed.2d 881].)[3]

In the wake of the United States Supreme Court decision in *Thornton*, supporters of congressional term limits instituted an organized campaign in

---

[1]Proposition 140 established a two-term limit for persons elected to the office of Governor (Cal. Const., art. V, § 2), Lieutenant Governor (*id.*, § 11), Attorney General (*ibid.*), Controller (*ibid.*), Secretary of State (*ibid.*), Treasurer (*ibid.*), Superintendent of Public Instruction (*id.*, art. IX, § 2), or to the State Board of Equalization (*id.*, art. XIII, § 17) or the state Senate (*id.*, art. IV, § 2, subd. (a)). The proposition established a three-term limit for persons elected to the state Assembly (*ibid.*).

[2]Proposition 164 would have prevented a person from being placed on the ballot as a candidate for an additional term if (1) the person was a candidate for the United States Senate and had served 12 or more of the previous 17 years as a senator from California, or (2) if the person was a candidate for the House of Representatives and had served 6 or more of the previous 11 years as a representative from California.

[3]The court in *Thornton* stated in this regard: "We are . . . firmly convinced that allowing the several States to adopt term limits for congressional service would effect a fundamental change in the constitutional framework. *Any such change must come not by legislation adopted either by Congress or by an individual State, but rather—as have other important changes in the electoral process—through the amendment procedures set forth in Article V.*" (514 U.S. at p. 837 [115 S.Ct. at p. 1871], italics added, fn. omitted.)

numerous states to secure the adoption of an amendment to the federal Constitution that would establish congressional term limits. The drafting and circulation of the initiative measure that ultimately became Proposition 225 was part of that multistate campaign.

B

Proposition 225 is a statutory initiative measure that adds a new article— entitled "The Congressional Term Limits Act" (hereafter the Act)—to the California Elections Code, commencing with section 10204.1.[4] (The full text of Proposition 225, including its introductory preamble, is set forth in an appendix to this opinion.)

Section 10204.1, the initial section of the Act, declares that "[i]t is the official position of the People of the State of California that our elected officials should vote to enact, by amendment to the U.S. Constitution, congressional term limits which are no longer than three terms in the U.S. House of Representatives, nor two terms in the U.S. Senate." Section 10204.2 further states that "[i]t is the will of the People of the State of California that application be made to Congress on behalf of the People of California and the California Legislature that Congress adopt the following amendment to the U.S. Constitution," and then sets out, verbatim, the text of a specific congressional term limits amendment.[5]

The following section of the Act, section 10204.3, provides that "[t]he California Legislature, due to the desire of the People of the State of California to establish term limits on the Congress of the United States, is hereby instructed to make the following application to Congress, pursuant to its power under Article V of the U.S. Constitution" (italics added), and sets

---

[4]Proposition 225 added article 1.2 (commencing with section 10204.1) to chapter 2 of part 2 of division 10 of the Elections Code. It is not clear why the drafters of Proposition 225 chose this location in the Elections Code; division 10 generally includes regulations relating to local elections, and chapter 2 of part 2 of division 10 deals specifically with regulations governing city elections.

Unless otherwise specified, all further statutory references are to the Elections Code.

[5]The text of the proposed Congressional Term Limits Amendment, as set forth in section 10204.2, reads as follows:

"Section A. No person may serve in the office of U.S. Representative for more than three terms, but upon ratification of the Term Limits Amendment no person who has held the office of U.S. Representative or who then holds the office may serve for more than two additional terms.

"Section B. No person may serve in the office of U.S. Senator for more than two terms, but upon ratification of the Term Limits Amendment no person who has held the office of U.S. Senator or who then holds the office may serve more than one additional term.

"Section C. This article shall have no time limit within which it must be ratified by the legislatures of three-fourths of the several states."

forth, verbatim, the text of the application to Congress that the Legislature is instructed to submit.[6] Sections 10204.4 and 10204.6, in turn, expressly provide that *each state legislator and each member of the California congressional delegation "is hereby instructed* to use all of his or her delegated powers" (italics added) to adopt the specific Congressional Term Limits Amendment set forth in section 10204.2.

Sections 10204.5, 10204.7, and 10204.9—which essentially comprise the enforcement mechanism of the Act—provide that at each primary and general election for the offices of United States representative, United States senator, state senator, or member of the Assembly, "the ballot shall inform voters regarding any incumbent or nonincumbent candidate's failure to support the above proposed Congressional Term Limits Amendment," specifying that the phrase "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" shall be printed adjacent to the name of any incumbent state or federal legislator who failed to support the amendment in a variety of specific circumstances identified by the provisions,[7] and that the phrase "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" shall be printed adjacent to the name

---

[6]The text of the application to Congress, as set forth in section 10204.3, reads as follows: "We, the People and Legislature of the State of California, due to our desire to establish term limits on the Congress of the United States, hereby make application to Congress, pursuant to our power under Article V of the U.S. Constitution, to call a convention for proposing amendments to the Constitution."

[7]Section 10204.5, subdivision (b), provides that the phrase "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" shall be printed adjacent to the name *of any state senator or member of the Assembly* "who during the regular legislative session following the most recent general election:

"(1) Failed to vote in favor of the application set forth in Section 10204.3 when brought to a vote; or

"(2) Failed to second the application set forth in Section 10204.3 if it lacked for a second; or

"(3) Failed to vote in favor of all votes bringing the application set forth in Section 10204.3 before any committee or subcommittee upon which he or she served in the respective houses; or

"(4) Failed to propose or otherwise bring to a vote of the full legislative body the application set forth in Section 10204.3 if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the application set forth above; or

"(5) Failed to vote against any attempt to delay, table, or otherwise prevent a vote by the full legislative body of the application set forth in Section 10204.3; or

"(6) Failed in any way to ensure that all votes on the application set forth in Section 10204.3 were recorded and made available to the public; or

"(7) Failed to vote against any change, addition, or modification to the application set forth in Section 10204.3; or

"(8) Failed to vote in favor of the amendment set forth in Section 10204.2 if it was sent to the states for ratification; or

"(9) Failed to vote against any term limits amendment other than the proposed amendment set forth in Section 10204.2, if such an amendment was sent to the states for ratification."

Section 10204.7 provides that the phrase "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" shall be printed adjacent to the name *of any United States representative or United*

of any nonincumbent candidate who declines to sign a "Term Limits Pledge" upon filing as a candidate for such office.[8] (In light of these ballot designation provisions, Proposition 225 frequently has been referred to as a "scarlet letter" initiative.)[9] Section 10204.9 also provides that the Secretary of State shall make the determination as to whether either of the specified phrases shall appear adjacent to the name of each candidate on the ballot (§ 10204.9, subds. (d), (e), (f), (g)), and further provides that, in each instance, the candidate or "any elector" shall have the right to appeal the Secretary of State's determination directly to this court, that the party who maintains that the designations specified in the Act should not appear on the ballot shall bear the burden of demonstrating, by clear and convincing proof, that such information should not be printed on the ballot, and that this court shall hear and decide the appeal within 120 days or not later than 61 days before the date of the election. (*Id.*, subds. (h), (i), (j).)

Finally, section 10204.10 provides that when the Congressional Term Limits Amendment set forth in section 10204.2 becomes part of the United

---

*States senator* "who during the first 12 months of the regular session following the most recent election:

"(a) Failed to vote in favor of the proposed Congressional Term Limits Amendment set forth in Section 10204.2 when brought to a vote; or

"(b) Failed to second the proposed Congressional Term Limits Amendment set forth in Section 10204.2 if it lacked for a second before any proceeding of the legislative body; or

"(c) Failed to propose or otherwise bring to a vote of the full legislative body the proposed Congressional Term Limits Amendment set forth in Section 10204.2 if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

"(d) Failed to vote in favor of all votes bringing the proposed Congressional Term Limits Amendment set forth in Section 10204.2 before any committee or subcommittee upon which he or she served in the respective houses; or

"(e) Failed to vote against or reject any attempt to delay, table, or otherwise prevent a vote by the full legislative body of the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

"(f) Failed to vote against any term limits proposal other than the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

"(g) Sponsored or co-sponsored any proposed Constitutional amendment or law that proposes term limits other than those in the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

"(h) Failed to ensure that all votes on the proposed Constitutional Term Limits Amendment set forth in Section 10204.2 were recorded and made available to the public."

[8]Subdivision (a) of section 10204.9 provides that each nonincumbent candidate "shall be permitted to sign a 'Term Limits Pledge' each time he or she files as a candidate," and subdivision (c) of section 10204.9 then sets forth in full the text of the Term Limits Pledge, which reads: "I support congressional term limits and pledge to use all of my legislative powers to enact the proposed Congressional Term Limits Act. If elected, I pledge to act and vote in such a way that the information 'DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS' will not appear next to my name."

[9]Hawthorne, The Scarlet Letter (1850; reprinted 1929 by Houghton Mifflin).

States Constitution "this article automatically shall be repealed," and section 10204.11 sets forth a standard severability clause.

C

As noted, Proposition 225 was placed on the ballot through the initiative process. After the Secretary of State determined that the initiative petition had obtained the requisite number of signatures, the measure was placed on the June 1998 Primary Election ballot.

In late February 1998, shortly before the June 1998 election ballot was scheduled to be submitted to the state printer, a petition for an original writ of mandate was filed in this court, seeking an order to compel the Secretary of State to remove Proposition 225 from the June 1998 ballot. (*Vanderveen v. Jones* (S068184).) After considering the petition and letters filed by the Secretary of State and the Attorney General, we denied the petition on the ground that the lateness of the filing of the petition in conjunction with the apparent lack of an adversary party had denied the court "the opportunity to provide full and meaningful review." Our order expressly noted that "[t]he denial of the petition is without prejudice to the consideration of a new petition should the challenged initiative measure be adopted."

Thereafter, in the ballot pamphlet circulated to voters in advance of the June 1998 election, the "Argument in Favor of Proposition 225" stated in full: "This initiative was part of a national campaign to enact a constitutional amendment for term limits on Congress. Unfortunately, similar initiatives passed in other states have been overturned in court, and this approach has been dropped. Thus, passage of this measure will likely result only in needless and costly litigation. In fact, in order to save taxpayer money, we went to court to avoid a meaningless election. [¶] Nothing is more important to the future of our country than returning Congress to the citizen legislature designed by our Founders. We remain committed to term limits on Congress and are happy to know that a superior measure, and one clearly constitutional, will appear on the November ballot." (Ballot Pamp., Proposed initiatives with arguments to voters, Primary Elec. (June 2, 1998), argument in favor of Prop. 225, p. 26.)[10]

Notwithstanding the content of the argument submitted in favor of Proposition 225 (which, as just noted, indicated that the approach embodied in

---

[10]Although petitions for another congressional term limit initiative, planned for the November 1998 ballot, were circulated in California, the measure failed to obtain the requisite number of signatures within the required time period, and no congressional term limit measure appeared on the November 1998 ballot.

Proposition 225 "has been dropped" and that "passage of this measure will likely result only in needless and costly litigation"), that proposition was narrowly approved at the June 1998 election, receiving a "yes" vote of 52.89 percent.

The adoption of Proposition 225 came too late to have an effect on the November 1998 congressional or state legislative election ballots,[11] and thus the first statewide election that will be affected by the measure is the year 2000 Primary Election. On February 25, 1999, petitioners—a taxpayer and registered voter, a prospective candidate for legislative office, and two current elected officials[12]—instituted the present proceeding in this court, seeking an original writ of mandate to compel the Secretary of State not to enforce the provisions of Proposition 225. In requesting this court to exercise original jurisdiction, petitioners pointed out that the validity of Proposition 225 is of considerable general public importance because it affects candidates in all state and congressional Primary and General Elections in the year 2000. Petitioners further noted that the 2000 Primary Election will be held on March 7, 2000, three months earlier than primary elections have been held in the past, and that the election cycle for the 2000 election will begin in November 1999, when candidates may begin filing their nomination papers for the offices in question. In order to avoid confusion with regard to the duties of the Secretary of State[13] and the obligations of candidates for public office,[14] and to attempt to ensure that the issue would be resolved in advance of the beginning of the year 2000 election cycle, we determined that

[11]Proposition 225 requires the Secretary of State to determine whether either of the two designations should appear on the ballot adjacent to a nonincumbent candidate's name not later than five days after the deadline for filing for the office. (See § 10204.9, subd. (g).) That deadline for the 1998 election had expired well before Proposition 225 became effective on the day after the June 3, 1998, Primary Election. (Cal. Const., art. II, § 10, subd. (a).)

[12]Petitioners are Nancy Bramberg (a taxpayer and registered voter), Linda DeGroat (a registered voter and prospective candidate for the United States House of Representatives), John Burton (President pro Tempore of the California Senate, who indicates in a declaration that he intends to run for reelection), and Nancy Pelosi (a member of the United States House of Representatives, who indicates in a declaration that she intends to run for reelection).

[13]With regard to candidates who are incumbent legislators, Proposition 225 requires the Secretary of State to make a determination as to whether the words "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" will appear next to the candidate's name, on the basis of an evaluation of the incumbent's actions with regard to a variety of circumstances. (See §§ 10204.5, subd. (b)(1)-(9); 10204.7, subds. (a)-(h).) The measure requires the Secretary of State to complete his or her evaluation no later than 13 months after a new legislative session has been convened. (See § 10204.9, subd. (f).) Thus, with regard to incumbent state legislators, it appears that Proposition 225 requires the Secretary of State to complete the evaluation by the beginning of January 2000 and, with regard to incumbent members of Congress, by the beginning of February 2000.

[14]Under Proposition 225, a nonincumbent candidate must make the decision whether or not to sign the "Term Limits Pledge" set forth in Proposition 225 at the time he or she files for office. (See § 10204.9, subd. (a).)

this was an appropriate instance in which to exercise our original jurisdiction. (See, e.g., *Legislature* v. *Eu, supra,* 54 Cal.3d 492, 500; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 98 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029].) ▆▆▆▆ Accordingly, on April 14, 1999, we issued an order to show cause to the Secretary of State, returnable before this court, and established an accelerated briefing and oral argument schedule.[15]

## II

▆▆ Petitioners contend that the provisions of Proposition 225 violate both the federal and state Constitutions in numerous respects. As we shall explain, we agree with their principal contention that the proposition violates Article V of the United States Constitution, which prescribes the method of amending the federal Constitution. For this reason, we need not and do not reach their additional contentions that Proposition 225 also denies the rights to freedom of speech, to vote, to seek public office, to the equal protection of the laws, and to a republican form of government, all as guaranteed by the federal Constitution (U.S. Const., art. I, § 6; *id.,* art. IV, § 4; *id.,* 1st Amend.; *id.,* 14th Amend.), and that it also denies the rights to freedom of speech, to vote, to seek public office, and to equal protection of the laws as guaranteed by the California Constitution. (Cal. Const., art. I, §§ 1, 2, 7.)

## A

Article V establishes the conditions under which the federal Constitution may be amended. It provides in relevant part: "The Congress, whenever

---

[15]There is no contention that this mandate proceeding, challenging the validity of Proposition 225, does not present a justiciable controversy, and, in any event, such a contention would lack merit. (See, e.g., *Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 751 [100 Cal.Rptr. 290, 493 P.2d 1154] ["Mandamus is clearly the proper remedy for compelling an officer to conduct an election according to law. [Citations.] Mandamus is also appropriate for challenging the constitutionality or validity of statutes or official acts."].) Petitioners, as taxpayers, registered voters, incumbent legislators and potential candidates for legislative office, are directly affected by the alleged invalidity of the challenged proposition. (See, e.g., *Legislature* v. *Eu, supra,* 54 Cal.3d 492, 500.) The Secretary of State, while declining to take a definitive position with regard to the constitutional validity of the measure, has noted that the measure is entitled to a presumption of constitutionality, and he has ably marshalled the relevant authority on the constitutional issue and has indicated that he will enforce the measure unless restrained from doing so by court order. Thus, it is clear that there is an actual, existing controversy to be resolved by this court. Furthermore, there is absolutely no indication that the proceeding is collusive or otherwise improper. In addition to naming the Secretary of State as respondent, petitioners served the petition on David Alessio, a proponent of the initiative measure who submitted the measure to the Attorney General for preparation of a title and summary. The circumstance that neither Alessio, nor some other supporter of the proposition, sought to intervene in this matter or to file an amicus curiae brief in support of the measure cannot and does not deprive this court of the authority to hear and resolve this matter. (See, e.g., *Golden Gate Bridge etc. Dist.* v. *Felt* (1931) 214 Cal. 308, 319-320 [5 P.2d 585].)

two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three-fourths of the several states, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress . . . ." (*Ibid.*)

Thus, Article V creates two methods by which an amendment to the federal Constitution may be proposed and two methods by which a proposed amendment may be ratified. An amendment may be proposed (1) by a favorable vote of two-thirds in each house of Congress, or (2) by a constitutional convention when the legislatures of two-thirds of the states apply to Congress to call such a convention. Any amendment proposed either by Congress or a constitutional convention then must be ratified, either (1) by three-fourths of the state legislatures, or (2) by conventions in three-fourths of the states, as Congress chooses.

The United States Supreme Court has held that the means for amending the federal Constitution set forth in Article V are exclusive and may not be modified by state law. In *Hawke v. Smith, No. 1* (1920) 253 U.S. 221 [40 S.Ct. 495, 64 L.Ed. 871, 10 A.L.R. 1504] (*Hawke*), the court was faced with the question whether the State of Ohio validly had ratified the 18th Amendment, relating to the prohibition of the sale of alcohol. The Ohio Legislature had ratified the amendment, but a section of the Ohio Constitution provided that the legislature's ratification of any proposed amendment to the United States Constitution was subject to the people's reserved right of referendum. A referendum petition had been filed following the Ohio Legislature's ratification of the amendment, and a referendum election had not yet taken place. In *Hawke*, the United States Supreme Court determined that, under Article V, the power to ratify proposed amendments to the federal Constitution was granted only to state "legislatures" acting as deliberative bodies, and held that the State of Ohio had no authority to modify this prescribed process by providing that the action of its legislature in ratifying a proposed amendment to the United States Constitution was subject to the people's right of referendum.

In reaching this conclusion, the court in *Hawke* first observed that Article V provides for the proposal of amendments either by the favorable vote of two-thirds of both houses of Congress or on application of the legislatures of two-thirds of the states, "thus securing deliberation and consideration before any change can be proposed." (253 U.S. at p. 226 [40 S.Ct. at p. 497].) The court then explained that "[t]he proposed change can only become effective

by the ratification of the legislatures of three-fourths of the States, or by conventions in a like number of States. The method of ratification is left to the choice of Congress. *Both methods of ratification, by legislatures or conventions, call for action by deliberative assemblages representative of the people, which it was assumed would voice the will of the people.*" (*Id.* at pp. 226-227 [40 S.Ct. at p. 497], italics added.) The court in *Hawke* observed that "[t]he framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people, or to some authority of government other than that selected. The language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the methods which the Constitution has fixed." (*Id.* at p. 227 [40 S.Ct. at p. 497].) Because it concluded that the framers of the Constitution, by using the term "legislature," clearly had referred to *"the representative body* which made the laws of the people" (*ibid.*, italics added), and not to a direct vote of the people themselves, the court in *Hawke* concluded that, under Article V, Ohio had no authority to require the submission of the state legislature's ratification of the amendment to a referendum.[16]

Two years after *Hawke*, the United States Supreme Court addressed another issue relating to the effect of state restrictions upon the federal constitutional amendment process. In *Leser* v. *Garnett* (1922) 258 U.S. 130 [42 S.Ct. 217, 66 L.Ed. 505] (*Leser*), the court was faced with the question whether the 19th Amendment, which extended the right to vote to women, had become part of the federal Constitution. Although the required number of state legislatures had ratified the amendment, the petitioners in *Leser* claimed that in light of provisions contained in the constitutions of a number of the ratifying states, the legislatures in those states lacked authority to ratify the proposed amendment, thus rendering inoperative the ostensible ratification by those states' legislatures. In *Leser*, the high court rejected the argument, noting that "the function of a state legislature in ratifying a proposed amendment to the Federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed

---

[16]Two months prior to the United States Supreme Court's decision in *Hawke*, this court had reached precisely the same conclusion in *Barlotti* v. *Lyons* (1920) 182 Cal. 575 [189 P. 282], in rejecting a petition that sought to compel a registrar of voters to file and transmit to the Secretary of State a referendum petition relating to the California Legislature's then recent ratification of the 18th Amendment. The court in *Barlotti*, after an extended analysis, concluded that Article V of the United States Constitution "admits of only one reasonable construction, that in the matter of ratifying a proposed amendment the people of the respective states shall speak on the question of ratification *solely and finally through their official representative legislative bodies*, where the Congress in submitting the amendment proposes that method of ratification." (182 Cal. at p. 583, italics in original.)

by the people of a State. [Citations.]" (258 U.S. at p. 137 [42 S.Ct. at pp. 217-218].) Thus, the decision in *Leser* makes it clear that a state may not, through restrictions imposed by state law, interfere with a state legislature's ability to fulfill its function and responsibilities as contemplated by Article V of the federal Constitution.

Although the decisions in *Hawke* and *Lesser* establish that a state's electorate may not usurp the authority that Article V grants to the members of Congress or a state legislature, the United States Supreme Court has not completely foreclosed a state's electorate from contributing some input to the amendment process. In *Kimble* v. *Swackhamer* (1978) 94 Nev. 600 [584 P.2d 161], the Nevada Supreme Court considered the validity under Article V of an advisory question that the Nevada Legislature proposed to submit to the voters of that state, requesting the electorate's view on the proposed ratification of the Equal Rights Amendment that had been submitted to the state legislatures by Congress. The Nevada statute providing for the submission of the measure to the voters expressly stated that " 'the result of the voting on this question does not place any legal requirement on the legislature or any of its members.' " (584 P.2d at p. 162, quoting 1977 Nev. Stat., ch. 174, §§ 3, 5.) In its decision in *Kimble*, the Nevada Supreme Court concluded that presenting the advisory question to the voters would not violate Article V, because the measure "does not concern a binding referendum, nor does it impose a limitation upon the legislature." (584 P.2d at p. 162.)

After the Nevada court's decision, the opponents of the measure filed an application with then Justice Rehnquist, as Circuit Justice for the Ninth Circuit, arguing that the submission of such a question to the state's voters would violate Article V and requesting that he enjoin placement of the measure on the Nevada ballot pending review by the entire United States Supreme Court. In rejecting the application and refusing to enjoin the vote, Justice Rehnquist stated: "I would be most disinclined to read either *Hawke*, *supra*, or *Leser*, *supra*, or Art. V as ruling out communication between the members of the legislature and their constituents. If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no constitutional obstacle to a nonbinding, advisory referendum of this sort." (*Kimble* v. *Swackhamer* (1978) 439 U.S. 1385, 1387-1388 [99 S.Ct. 51, 54, 58 L.Ed.2d 225] (per Rehnquist, J. as Cir. J.).) The United States Supreme Court, as a whole, took no action to countermand or supersede Justice Rehnquist's decision in *Kimble*. Thus, *Kimble* suggests that there are at least some circumstances in which the submission of a ballot proposition relating to an amendment to the federal Constitution will not violate Article V.

B

Unlike the referendum provision in *Hawke*, Proposition 225 does not pose a formal *direct* conflict or interference with the amendment process established by Article V, because the proposition before us, by its terms, recognizes that it is Congress and the state Legislature, rather than the people through the initiative or referendum process, that have the authority to propose and ratify amendments to the United States Constitution. On the other hand, unlike the measure at issue in *Kimble*, Proposition 225 clearly is not a purely advisory measure submitted to the voters by the Legislature, but rather is an initiative measure that was placed on the ballot through a petition signed by the requisite number of voters, and that directs congressional and state legislators to use their legislative authority to support the adoption of a specific constitutional amendment that is set forth in the measure and prescribes consequences for legislators who fail to provide such support. As we shall see, recent decisions analyzing analogous efforts to use state initiative measures to control the amendment process established by Article V teach that Proposition 225 goes beyond a permissible advisory measure and conflicts with Article V.

In *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609], for example, this court addressed a preelection challenge to an initiative measure that purported to require the California Legislature to adopt a specified resolution (1) urging Congress to propose a balanced federal budget amendment to the United States Constitution, and (2) applying to Congress to convene a constitutional convention for the sole purpose of proposing such an amendment. The measure further provided that if the Legislature failed to adopt the specified resolution by the 20th legislative day after the voters' approval of the measure, all compensation of every member of the Legislature " 'shall be suspended . . . until such time as the California Legislature adopts such resolution. . . .' " (*Id.* at p. 693.) Finally, the measure provided that if the Legislature failed to adopt such a resolution within 40 days of the measure's approval, the Secretary of State was directed to transmit the resolution to the President and Secretary of the United States Senate, and to the Speaker and Clerk of the United States House of Representatives.

In the decision in *American Federation of Labor* v. *Eu*, this court, relying upon the United States Supreme Court decisions in *Hawke* and *Leser*, held that the heart of the proposed initiative violated Article V, concluding that "Article V provides for applications by the 'Legislatures of two-thirds of the several States,' not by the people through the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through

the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise." (36 Cal.3d at p. 694.)

At the same time that the *American Federation of Labor* v. *Eu* case was before this court, the Supreme Court of Montana was considering the validity of a very similar measure—Initiative No. 23—that had been proposed for the ballot in Montana. Like the California measure, the Montana measure purported to direct the state legislature to adopt a specific resolution calling upon Congress to convene a constitutional convention for the purpose of adopting a balanced federal budget amendment. The Montana measure further provided that if the resolution were not adopted in 90 days, the legislature must remain in session without compensation to its members, and with no recess in excess of 3 calendar days, until the resolution was adopted. In *State* ex rel. *Harper* v. *Waltermire* (1984) 213 Mont. 425 [691 P.2d 826], the Supreme Court of Montana, relying upon *Hawke* and *Leser*, reached the same conclusion as our court reached in *American Federation of Labor,* finding that "whenever a state legislature acts to amend the United States Constitution under Article V powers, the body must be a deliberative representative assemblage acting in the absence of any external restrictions or limitations. Initiative No. 23 is facially unconstitutional for precisely this reason. The measure attempts to direct and orchestrate the legislative application process in contravention of the plain language of Article V." (691 P.2d at p. 830.)

In our view, the reasoning of the decisions in *American Federation of Labor* and *Harper* applies equally to Proposition 225, because the measure instructs California congressional and state legislators to support the congressional term limits amendment set forth in the proposition and requires the Secretary of State to include, on ballots circulated in future elections, a negative statement adjacent to the name of any candidate for such legislative office who does not support the amendment. Although Proposition 225, unlike the measures at issue in *American Federation of Labor* and *Harper,* does not threaten to withhold the pay of members of Congress or state legislators who fail to support the proposed amendment, the adverse consequences that are likely to result from the negative ballot designations mandated by Proposition 225 render the measure as impermissibly coercive as the measures struck down in *American Federation of Labor* and *Harper.*

We find support for this conclusion in numerous recent decisions from other jurisdictions that have found measures analogous to Proposition 225 unconstitutional under Article V. In *Morrissey* v. *State* (Colo. 1998) 951 P.2d 911 (*Morrissey*), for example, the Supreme Court of Colorado explained that

insofar as the measure before it (like the provisions of Proposition 225) directed state and congressional representatives "to propose and ratify a specified amendment to the United States Constitution[,] . . . [the measure] clearly violates the strict language of Article V, which precludes state citizens from direct participation in the amendment process." (951 P.2d at p. 916.) Furthermore, the court in *Morrissey* concluded that "citizens may not use ballot designations to coerce their elected officials into amending the federal Constitution. We disagree with the . . . claim that [the measure's] ballot designations are merely informational and resemble other permissible designations such as the candidate's party affiliation. Contrary to such passive and informational designations, [the measure's] ballot designations are negative and instructional, apprising voters of particular candidates who have disregarded or declined to follow the people's will and are therefore unworthy of holding public office. The usual and expected consequence of these state sanctioned labels, which incite voters at precisely the moment when they are most susceptible to persuasion, is more votes cast in favor of other, more cooperative candidates. [Citations.] Besides the obvious impact such designations have on the vote tally, candidates are also barred from having any real opportunity to respond to ballot designations, despite the fact that the designation may be seriously misleading in some situations." (*Ibid.*, fn. omitted.)[17] Accordingly, the court in *Morrissey* concluded that the challenged measure violated Article V, "because it attempts to usurp our elected representatives' exclusive authority to amend the United States Constitution using explicit mandates and coercion." (951 P.2d at p. 917.)

The Supreme Courts of Arkansas and Oklahoma, as well as the federal Court of Appeals for the Eighth Circuit and federal district courts in Maine, Missouri and South Dakota, all have arrived at the same conclusion reached by the Colorado Supreme Court in *Morrissey* in finding ballot designations similar to those mandated by Proposition 225 impermissibly coercive and violative of Article V. (See, e.g., *Donovan v. Priest* (1996) 326 Ark. 353 [931 S.W.2d 119, 127-128] ["Although the proposed [measure] does not compel such action by the legislature on threat of loss of salary, it is nonetheless binding on the legislators in an extortive manner as failure to heed the amendment's instructions will result in their threatened potential political deaths. . . . [T]he proposed duties to be given to the Secretary of State . . . are not merely ministerial; rather, they amount to substantive penalties that are equivalent to an officially sanctioned recommendation by

---

[17]With respect to the latter point, the court in *Morrissey* explained that "a legislator in favor of congressional terms limits may question the wisdom of calling a constitutional convention where a multitude of constitutional amendments, wholly unrelated to term limits, could also be proposed. Despite the fact that the legislator favors term limits, the legislator would nevertheless receive a ballot designation denoting otherwise if he seeks to amend or oppose the Term Limits Amendment." (951 P.2d at p. 916, fn. 7.)

the State of Arkansas not to vote for such candidates because they disregarded the instructions and wishes of the voters."]; *In re Initiative Petition No. 364* (1996) 1996 Okla. 129 [930 P.2d 186, 193] ["This measure . . . would be neither nonbinding nor purely advisory in its federal aspects."]; *Miller* v. *Moore* (8th Cir. 1999) 169 F.3d 1119, 1124 ["[The Nebraska measure at issue] represents a clear attempt to coerce or bind legislators into exercising their Article V powers to pass a term limits amendment. The language of [the measure] is mandatory: . . . it 'instructs lawmakers to proceed on a precise and inflexible course of action utilizing the full range of their Article V authority' [citation]. [The measure] penalizes legislators who disobey its mandate, moreover, by notifying the voters in the next election that these legislators have 'disregarded' the voters' 'instructions' on term limits. We do not think that such a provision can plausibly be read as merely advisory."]; *League of Women Voters of Maine* v. *Gwadosky* (D.Me. 1997) 966 F.Supp. 52, 59-60 ["The ballot labels [at issue] are certainly not neutral. . . . They are brands of disapproval by the State and are only placed next to the names of candidates who do not perform in accordance with the Act. . . . To disseminate such negative labels next to a candidate's name at a time when the voter is most susceptible to persuasion, i.e., while in the ballot box, would certainly influence Maine's elected officials when they are deliberating and voting on the term limits issue. . . . Article V's required deliberative and independent process is lost." (Italics and fn. omitted.)]; *Gralike* v. *Cook* (W.D.Mo. 1998) 996 F.Supp. 901, 916 ["The attempt by the people of Missouri to use the threat of negative ballot designations to 'encourage' their congressional delegates to propose a term limits amendment violates Article V because it interferes with the independent judgment of state legislators or convention delegates that is contemplated by Article V."]; *Barker* v. *Hazeltine* (D.S.D. 1998) 3 F.Supp.2d 1088, 1094 ["The ballot labels at issue here are not neutral. . . . To suggest that placement of such labels on the ballot would not affect a congressional candidate's judgment 'raises naivete to new heights.' [Citation.] Without doubt, [the measure] brings to bear an undue influence on South Dakota's congressional candidates, and the deliberative and independent amendment process envisioned by the Framers when they drafted Article V is lost."].)[18]

In sum, viewing Proposition 225 as a whole, there can be little doubt as to its intent or likely consequences. By its terms, Proposition 225 *instructs* members of the California congressional delegation and state legislators to use their legislative authority to support the specific congressional term

---

[18]In *Simpson* v. *Cenarrusa* (1997) 130 Idaho 609 [944 P.2d 1372], the Supreme Court of Idaho found that ballot designations similar to those contained in Proposition 225 were unconstitutional under the speech and debate clause (art. I, § 6) and the First Amendment of the United States Constitution. (944 P.2d at pp. 1374-1376.)

limits amendment set forth in the proposition. And the mandated ballot designations for both incumbent and nonincumbent candidates who do not support the proposed amendment are worded in a manner that is plainly designed to disadvantage a candidate to whose name such a designation is attached. The controlling United States Supreme Court decisions make it clear that under Article V the process of amending the United States Constitution has been vested in the Congress and the state legislatures acting as deliberative, representative bodies, and that the voters of a state may not, through exercise of the referendum or initiative power, thwart or mandate the operation of the federal constitutional amendment process. We therefore conclude that Proposition 225 improperly attempts to do indirectly what Article V plainly prohibits the electorate from doing directly—that is, usurp the authority assigned to California's congressional members and to its state legislators in the federal constitutional amendment process. ▆▆ ▆▆ Accordingly, we conclude that Proposition 225 violates Article V of the United States Constitution and cannot be enforced.[19]

---

[19]Although no party has suggested that any provision of Proposition 225 properly may be severed from the remainder of the proposition and upheld on its own, we discuss the issue briefly because Proposition 225 contains a severability clause (§ 10204.11) and because several of the out-of-state decisions that have addressed measures similar to Proposition 225, after concluding that the prescribed ballot designations were invalid, have gone on to find that other portions of the challenged measures were severable and could be upheld under Article V as nonbinding advisory measures. (See *Simpson* v. *Cenarrusa, supra,* 944 P.2d 1372, 1376 [upholding provision "instruct[ing]" members of Congress and state legislators to amend federal Constitution, as a "non-binding, advisory initiative"]; *Miller* v. *Moore, supra,* 169 F.3d 1119, 1126 [upholding provision establishing, as the " 'official position of the citizens and State of Nebraska,' " that elected officials should enact a specific term limits amendment, as "advisory, nonbinding communication"].)

Contrary to the conclusion reached by the Idaho Supreme Court in *Simpson* v. *Cenarrusa, supra,* 944 P.2d 1372 at pages 1376-1377, we do not believe that the provisions of Proposition 225 that explicitly "instruct" California's congressional delegation and state legislators to use all of their delegated legislative powers to enact a specific amendment to the United States Constitution (§§ 10204.3, 10204.4, 10204.6) properly can be characterized as "non-binding, advisory" provisions that are permissible under Article V. By purporting to impose a statutory obligation upon such legislators to act in a particular manner with regard to the amendment process, these provisions clearly interfere with the operation of the procedure for amending the federal Constitution as contemplated and authorized by Article V. (See, e.g., *American Federation of Labor* v. *Eu, supra,* 36 Cal.3d 687, 706; *In re Initiative Petition No. 364, supra,* 930 P.2d 186, 193; *Barker* v. *Hazeltine, supra,* 3 F.Supp.2d 1088, 1094.)

Like the provision of the Nebraska law found severable and valid by the Eighth Circuit in *Miller* v. *Moore, supra,* 169 F.3d 1119, 1126, the first two sections of Proposition 225, sections 10204.1 and 10204.2, state, respectively, that "[i]t is the official position of the People of the State of California that our elected officials should vote to enact" a congressional term limits amendment to the federal Constitution, and that "[i]t is the will of the People of the State of California that application be made to Congress on behalf of the People of California and the California Legislature" to adopt such an amendment. To the extent that these sections might be viewed as constituting "non-binding, advisory" measures, permissible under Article V and severable from the remaining, more explicitly coercive provisions of

## III

Let a peremptory writ of mandate issue, directing the Secretary of State not to enforce the provisions of Proposition 225.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

Proposition 225 (as the Eighth Circuit concluded with respect to the analogous Nebraska provision in *Miller* v. *Moore*), it appears that under this court's decision in *American Federation of Labor* v. *Eu, supra,* 36 Cal.3d 687, such provisions would not constitute a valid initiative measure under the California Constitution. In *American Federation of Labor,* the court held that insofar as a provision of an initiative measure simply adopts a resolution calling upon Congress to propose an amendment of the federal Constitution, the measure "does not create law and thus . . . does not 'adopt' a 'statute' within the meaning of article II of the California Constitution." (36 Cal.3d at p. 714.) Accordingly, even if severable and not violative of Article V, these provisions, standing alone, would fall outside the scope of the initiative power established by the California Constitution. (Accord, *In re Initiative Petition No. 364, supra,* 930 P.2d 186, 193-197 [similar provisions held beyond the scope of the initiative power granted by the Oklahoma Constitution].) In its decision in *Miller* v. *Moore, supra,* 169 F.3d at page 1126, the Eighth Circuit did not address the question whether such an "advisory . . . communication" represented a permissible initiative measure under Nebraska law. (Cf. *State* ex rel. *Brant* v. *Beermann* (1984) 217 Neb. 632 [350 N.W.2d 18, 21-23].)

## APPENDIX

### Proposition 225: Text of Proposed Law*

This initiative measure is submitted to the people in accordance with the provisions of Article II, Section 8 of the Constitution. This initiative measure adds sections to the Elections Code; therefore, new provisions proposed to be added are printed in italic type to indicate that they are new.

### PROPOSED LAW

Whereas, Career politicians dominating Congress have a conflict of interest which prevents them from enacting meaningful term limits and making Congress what the Founders intended, the branch of government closest to the People; and

Whereas, Career politicians, while refusing to heed the desire of the People for meaningful term limits, amassed a nearly five trillion dollar national debt by not only voting year after year to spend far more than they have taken in, but also by voting to dramatically increase their own pay; also provided lavish million-dollar pensions for themselves and granted themselves numerous other privileges at the expense of the People; and

Whereas, Such irresponsible actions on the part of career politicians have mortgaged the future of not only every American citizen, but also their children and grandchildren; and

Whereas, The abuse of power, the corruption, and the appearance of corruption brought about by political careerism is ultimately destructive to representative government by making Congress increasingly distant from the People; and

Whereas, The President of the United States is limited to two terms in office by the 22nd Amendment to the U.S. Constitution, and governors in 40 states are limited by state laws to two terms or less, and

Whereas, Voters have established term limits for more than 2,000 state legislators, as well as more than 17,000 local officials across the nation, including state legislators and statewide elective officeholders in California, and

Whereas, In 1992, the People of the State of California enacted, by an overwhelming majority, an amendment to the state law limiting service in

*Ballot Pamphlet, Primary Election (June 2, 1998) at <http://Primary98.ss.ca.gov/Voter Guide/Propositions/225text.htm> [visited June 11, 1999].

the U.S. House of Representatives to three terms and in the U.S. Senate to two terms, which state-imposed congressional term limits were ruled unconstitutional by the U.S. Supreme Court, and

Whereas, Congress has ignored the desire of the People for meaningful term limits by refusing to pass an amendment instituting congressional term limits, and by proposing exceedingly long limits for its own members; and

Whereas, It is the People themselves, not Congress, who should set term limits; and

Whereas, The People have a sovereign right and a compelling interest in the creation and preserving of a citizen Congress that will more effectively protect their freedom and prosperity, which interest and right may not be as effectively served in any way other than that proposed by this initiative; and

Whereas, With foresight and wisdom our Founders, under Article V of the U.S. Constitution, did provide the People with a procedure by which to circumvent congressional self-interest, by which procedure the People may call a convention to propose amendments to the U.S. Constitution when two-thirds or 34 states expressly call for such a convention; and

Whereas, Amendments proposed by such a convention would become part of the U.S. Constitution upon the ratification of three-fourths of the states (38); and

Whereas, The People of the State of California desire to amend the U.S. Constitution to establish term limits on Congress to ensure representation in Congress by true citizen lawmakers;

Be it enacted by the People of the State of California:

**SECTION 1.** Article 1.2 (commencing with Section 10204.1) is added to Chapter 2 of Part 2 of Division 10 of the Elections Code, to read:

*Article 1.2. The Congressional Term Limits Act*

**10204.1.** *It is the official position of the People of the State of California that our elected officials should vote to enact, by amendment to the U.S. Constitution, congressional term limits which are not longer than three terms in the U.S. House of Representatives, nor two terms in the U.S. Senate.*

**10204.2.** *It is the will of the People of the State of California that application be made to Congress on behalf of the People of California and the*

California Legislature that Congress adopt the following amendment to the U.S. Constitution:

Congressional Term Limits Amendment

Section A. No person may serve in the office of U.S. Representative for more than three terms, but upon ratification of the Term Limits Amendment no person who has held the office of U.S. Representative or who then holds the office may serve for more than two additional terms.

Section B. No person may serve in the office of U.S. Senator for more than two terms, but upon ratification of the Term Limits Amendment no person who has held the office of U.S. Senator or who then holds the office may serve more than one additional term.

Section C. This article shall have no time limit within which it must be ratified by the legislatures of three-fourths of the several states.

10204.3. The California Legislature, due to the desire of the People of the State of California to establish term limits on the Congress of the United States, is hereby instructed to make the following application to Congress, pursuant to its power under Article V of the U.S. Constitution:

"We, the People and Legislature of the State of California, due to our desire to establish term limits on the Congress of the United States, hereby make application to Congress, pursuant to our power under Article V of the U.S. Constitution, to call a convention for proposing amendments to the Constitution."

10204.4. Each state legislator is hereby instructed to use all of his or her delegated powers to pass the Article V application to Congress set forth in Section 10204.3, and to ratify, if proposed by Congress, the Congressional Term Limits Amendment set forth in Section 10204.2.

10204.5. (a) As provided in this act, at each election for the office of United States Representative, United States Senator, State Senator, or Member of the Assembly, the ballot shall inform voters regarding any incumbent or nonincumbent candidate's failure to support the above proposed Congressional Term Limits Amendment.

(b) All primary, general, and special election ballots shall have the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" printed adjacent to the name of any State Senator or Member of the Assembly

who during the regular legislative session following the most recent general election:

(1) Failed to vote in favor of the application set forth in Section 10204.3 when brought to a vote; or

(2) Failed to second the application set forth in Section 10204.3 if it lacked for a second; or

(3) Failed to vote in favor of all votes bringing the application set forth in Section 10204.3 before any committee or subcommittee upon which he or she served in the respective houses; or

(4) Failed to propose or otherwise bring to a vote of the full legislative body the application set forth in Section 10204.3 if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the application set forth above; or

(5) Failed to vote against any attempt to delay, table, or otherwise prevent a vote by the full legislative body of the application set forth in Section 10204.3; or

(6) Failed in any way to ensure that all votes on the application set forth in Section 10204.3 were recorded and made available to the public; or

(7) Failed to vote against any change, addition, or modification to the application set forth in Section 10204.3; or

(8) Failed to vote in favor of the amendment set forth in Section 10204.2 if it was sent to the states for ratification; or

(9) Failed to vote against any term limits amendment other than the proposed amendment set forth in Section 10204.2, if such an amendment was sent to the states for ratification.

(c) The information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" as required by any of paragraphs (1) to (7), inclusive, of subdivision (b) shall not appear adjacent to the names of candidates for the State Senate or Assembly if the State of California has made the application to Congress for a convention for proposing amendments to the U.S. Constitution pursuant to this article and such application has not been withdrawn.

(d) The information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" as required by either of paragraphs (8) and (9) of subdivision

(b), shall not appear adjacent to the names of candidates for the State Senate or Assembly if the Congressional Term Limits Amendment set forth in Section 10204.2 has been submitted to the states for ratification and ratified by the California Legislature, or the proposed Congressional Term Limits Amendment set forth in Section 10204.2 has become part of the U.S. Constitution.

**10204.6.** Each member of the California congressional delegation is hereby instructed to use all of his or her delegated powers to pass the Congressional Term Limits Amendment set forth in Section 10204.2.

**10204.7.** All primary, general, and special election ballots shall have the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" printed adjacent to the name of any U.S. Representative or U.S. Senator who during the first 12 months of the regular legislative session following the most recent general election:

(a) Failed to vote in favor of the proposed Congressional Term Limits Amendment set forth in Section 10204.2 when brought to a vote; or

(b) Failed to second the proposed Congressional Term Limits Amendment set forth in Section 10204.2 if it lacked for a second before any proceeding of the legislative body; or

(c) Failed to propose or otherwise bring to a vote of the full legislative body the proposed Congressional Term Limits Amendment set forth in Section 10204.2 if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

(d) Failed to vote in favor of all votes bringing the proposed Congressional Term Limits Amendment set forth in Section 10204.2 before any committee or subcommittee upon which he or she served in the respective houses; or

(e) Failed to vote against or reject any attempt to delay, table, or otherwise prevent a vote by the full legislative body of the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

(f) Failed to vote against any term limits proposal other than the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

(g) Sponsored or co-sponsored any proposed Constitutional amendment or law that proposes term limits other than those in the proposed Congressional Term Limits Amendment set forth in Section 10204.2; or

(h) Failed to ensure that all votes on the proposed Constitutional Term Limits Amendment set forth in Section 10204.2 were recorded and made available to the public.

**10204.8.** The information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" may not appear adjacent to the names of a candidate for Congress if the Congressional Term Limits Amendment set forth in Section 10204.2 is before the states for ratification or has become part of the U.S. Constitution.

**10204.9.** Notwithstanding any other provision of California law,

(a) A nonincumbent candidate for the office of U.S. Representative and U.S. Senator, State Senator, or Member of the Assembly shall be permitted to sign a "Term Limits Pledge" each time he or she files as a candidate for such an office. A candidate who declines to sign the "Term Limits Pledge" shall have "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed adjacent to his or her name on the election ballot.

(b) Each time a nonincumbent candidate for U.S. Senator, U.S. Representative, State Senator, or Member of the Assembly files for candidacy, he or she shall be offered the "Term Limits Pledge," until such time as the U.S. Constitution has been amended to limit U.S. Senators to two terms in office and U.S. Representatives to three terms in office.

(c) The "Term Limits Pledge" that each nonincumbent candidate set forth above shall be offered is as follows:

"I support congressional term limits and pledge to use all of my legislative powers to enact the proposed Congressional Term Limits Amendment set forth in the Congressional Term Limits Act. If elected, I pledge to act and vote in such a way that the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" will not appear next to my name." The pledge form will provide a space for the signature of the candidate and the date signed.

(d) The Secretary of State shall be responsible to make an accurate determination as to whether a candidate for the state or federal legislature shall have placed adjacent to his or her name on the election ballot "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS."

(e) The Secretary of State shall consider timely submitted public comments prior to making the determination required in subdivision (d).

*(f) The Secretary of State, in accordance with subdivision (d) shall determine and declare what information, if any, shall appear adjacent to the names of each incumbent state and federal legislator if he or she is to be a candidate in the next general election. In the case of U.S. Representatives and U.S. Senators, this determination and declaration shall be made not later than 13 months after a new Congress has been convened, and shall be based upon Congressional action in the first 12 months of the regular session following the most recent general election. In the case of incumbent state legislators, this determination and declaration shall be made not later than 13 months after a new Legislature has been convened, and shall be based upon state congressional action in the first 12 months of the regular session following the most recent general election.*

*(g) The Secretary of State shall determine and declare what information, if any, will appear adjacent to the names of nonincumbent candidates for Congress and the California Legislature, not later than five days after the deadline for filing for the office.*

*(h) If the Secretary of State makes the determination that "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" may not be placed on the ballot adjacent to the name of a candidate for senator or representative for state or federal office, any elector shall appeal such decision within five days to the California Supreme Court as an original action or waive any right to appeal such decision; in which case the burden of proof shall be upon the Secretary of State to demonstrate by clear and convincing evidence that the candidate has met the requirements set forth in this article and therefore should not have the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed on the ballot adjacent to the candidate's name.*

*(i) If the Secretary of State determines that "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" shall be placed on the ballot adjacent to a candidate's name, the candidate shall appeal such decision within five days to the California Supreme Court as an original action or waive any right to appeal such decision; in which case the burden of proof shall be upon the candidate to demonstrate by clear and convincing evidence that he or she should not have the information "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" printed on the ballot adjacent to the candidate's name.*

*(j) The Supreme Court shall hear the appeal provided for in subdivision (h) and issue a decision within 120 days. The Supreme Court shall hear the*

appeal provided for in subdivision (i) and issue a decision not later than 61 days before the date of the election.

*10204.10.* At such time as the Congressional Term Limits Amendment set forth in Section 10204.2 has become part of the U.S. Constitution, this article automatically shall be repealed.

*10204.11.* Severability. If any portion, clause, or phrase of this act is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, the remaining portions, clauses, and phrases shall not be affected, but shall remain in full force and effect. The portions of this act shall supersede all inconsistent provisions of state law.